UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LINDA SCOTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:19 CV 399 ACL |
| ) | |
| ANDREW M. SAUL, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM**

Plaintiff Linda Scott brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Scott's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

## **I. Procedural History**

Scott filed her application for benefits on January 5, 2016, claiming that she became unable to work on May 30, 2013. (Tr. 168-74.) She later amended her alleged onset of

disability to November 3, 2014.  (Tr. 44, 182-83.)   Scott alleged disability due to a back injury, anxiety, and depression.  (Tr. 189, 194.)   Scott was 54 years of age at her alleged onset of disability.  *Id.*  Her application was denied initially.  (Tr. 101-07.)   Scott's claim was denied by an ALJ on May 30, 2018.  (Tr. 13-33.)   On January 14, 2019, the Appeals Council denied Scott's claim for review.  (Tr. 1-6.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Scott raises the following claims: (1) "the ALJ failed to fully and fairly develop the record;" (2) "the ALJ committed error in not applying the lower of two exertional levels;" (3) "the ALJ failed to comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to the opinion of the claimant's treating physicians, Dr. Sattler and Dr. Ilivicky;" (4) "the ALJ failed to consider the various factors set forth in 20 C.F.R. § 404.1527(d) in evaluating the opinion of the treating physician;" (5) "the ALJ committed reversible error in failing to accord proper weight to the opinion of Dr. Ilivicky, who is a specialist in the impairment of which the claimant suffers;" and (6) "the ALJ committed reversible error in according 'little, if any,' weight to the opinion of the claimant's treating therapist Stacy Guetschow as such opinions must be considered in determining how the claimant's impairment affects the ability to work, in accordance with 20 C.F.R. § 404.1513(d) and SSR 06-03p."  (Doc. 14 at p. 3.)

## II.  The ALJ's Determination

The ALJ first found that Scott last met the insured status requirements of the Act on December 31, 2014.  (Tr. 16.)   He next found that Scott did not engage in substantial gainful activity during the period from her alleged onset date of November 3, 2014, through her date last insured of December 31, 2014.  *Id.*   In addition, the ALJ concluded that Scott had the following

severe impairments: lumbar post-laminectomy syndrome; depression; and borderline intellectual functioning. *Id.* The ALJ found that Scott did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 17.)

As to Scott's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following additional limitations: she could lift up to 20 pounds occasionally, and could lift and carry up to 10 pounds frequently; could stand and walk for about six hours; and sit for up to six hours, in an eight-hour workday, with normal breaks; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; could never climb ladders, ropes, or scaffolds; should avoid unprotected heights and exposure to hazardous machinery; and was limited to simple, routine, and repetitive tasks.

(Tr. 21-22.)

The ALJ found that Scott was unable to perform any past relevant work, but was capable of performing other jobs existing in significant numbers in the national economy, such as hand packer and cleaner. (Tr. 31-33.) The ALJ therefore concluded that Scott was not under a disability, as defined in the Social Security Act, at any time from November 3, 2014, the alleged onset date, through December 31, 2014, the date last insured. (Tr. 33.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on January 5, 2016, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2014, the last date insured.

*Id.*

### III. Applicable Law

**III.A. Standard of Review**

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B. Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social

Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled,

regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant

numbers in the national economy.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.  20 C.F.R. § 416.920(a)(4)(v).  At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).  The Commissioner must then rate the degree of functional loss resulting from the impairments.  *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  *See id.*  Next, the Commissioner must determine the severity of the impairment based on those ratings.  *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  *See id.*  If there is a severe impairment, but the impairment does not meet or equal

the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

As an initial matter, the Court notes that Scott's insured status is relevant in this case. Scott alleged an onset of disability date of November 3, 2014. Her insured status expired on December 31, 2014. To be entitled to benefits under Title II, Scott must demonstrate she was disabled prior to December 31, 2014. *See* 20 C.F.R. § 404.130. Thus, the period under consideration in this case is from November 3, 2014, through December 31, 2014.

Scott must demonstrate not only the impairment, but the inability to work caused by the impairment lasted or was expected to last, not less than twelve months. *Barnhart v. Walton*, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether…a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

With these principles in mind, the undersigned will discuss Scott's claims. Four of Scott's claims (Claims 3, 4, 5, and 6) challenge the ALJ's evaluation of the medical opinion evidence from her treating physicians and her treating therapist. Her other claims pertain to the ALJ's development of the record in determining her RFC (Claim 1), and the ALJ's step five determination (Claim 2). The undersigned will discuss these claims in turn, beginning with the ALJ's evaluation of the medical opinion evidence.

1. **Opinion Evidence**

Scott first argues that the ALJ failed to accord adequate weight to the opinions of treating

Physicians Samantha Sattler, M.D., and Howard Ilivicky, M.D.

The record[1] indicates that Dr. Sattler completed a "Disability Status Update" form in April 2011, in connection with Scott's prior application for benefits. (Tr. 73.) This evidence is not included in the transcript for this case, and does not pertain to the relevant period. The ALJ did not err in failing to consider evidence not before him.

Dr. Ilivicky completed a "Disability Status Update" on October 2, 2015. (Tr. 287-89.) He listed Scott's diagnosis as "major depression, recurrent, severe," with symptoms of severe low mood, low motivation, slow speech, slow cognition, and passive suicidal thoughts. (Tr. 287.) Dr. Ilivicky stated that Scott's "cognitive processes, memory [and] decision making ability" are "all very slow—severely impacted." (Tr. 288.) Dr. Ilivicky expressed the opinion that Scott was unable to persist in a work environment," and is "unable to work." *Id.* He further stated that she is "unable to complete tasks, makes errors in work." *Id.*

The ALJ indicated that he was assigning "little weight" to Dr. Ilivicky's opinions. (Tr. 27.) He acknowledged that Dr. Ilivicky was a specialist in psychiatry and that he had a longstanding treating relationship with Scott. *Id.* The ALJ stated that Dr. Ilivicky's opinion was not "very timely," in that it was provided several months after Scott's date last insured of December 31, 2014. *Id.* The ALJ found that the opinions were not consistent with Dr. Ilivicky's own treatment of Scott. *Id.* For example, he noted that Dr. Ilivicky provided infrequent outpatient treatment between June 2013 and November 2017, seeing Scott approximately every three to six months. *Id.* Dr. Ilivicky did not ever recommend more frequent outpatient treatment or inpatient care, and his treatment notes reflect only a few changes

---

[1]This evidence is discussed in the opinion of the ALJ from the prior application. The actual medical records are not available to the undersigned.

to Scott's psychotropic medication regimen. *Id.* Finally, the ALJ pointed out that Dr. Ilivicky's opinion that Scott is unable to work is an ultimate question reserved to the Commissioner. *Id.*

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

Scott first saw Dr. Ilivicky in June 2013, at which time she complained that her adult son

hated her and was disrespectful toward her. (Tr. 263.) She also reported that her application for disability benefits had been denied and that she was appealing the decision. *Id.* Scott described herself as forgetful. *Id.* Dr. Ilivicky diagnosed Scott with depression and grief. *Id.* He prescribed psychotropic medications. *Id.* Scott next saw Dr. Ilivicky in September 2013, at which time she again reported problems with her children and her disability claim. (Tr. 262.) Upon mental status examination, Dr. Ilivicky noted Scott seemed confused and was very slow. *Id.* He remarked that he was not sure what medications she was taking. *Id.* In March 2014, Dr. Ilivicky found that Scott seemed more alert. (Tr. 261.) In September 2014, Scott reported that she was "not doing good." (Tr. 260.) She reported issues with her ex-husband and children. *Id.* On examination, she was disheveled, exhibited intermittent eye contact, her speech was slightly dysarthric, her memory was decreased, and her affect was "fragile." *Id.* In April 2015, Scott reported her adult son had a drug problem and she had to kick him out. (Tr. 259.) Upon examination, Scott was well-groomed, she reported her mood was better, her affect was appropriate, and she seemed more alert. *Id.* In September 2015, Scott reported that her son was in prison. (Tr. 258.) Upon examination, she was well-groomed but mildly disheveled; and her speech was slow, but she was more alert. *Id.*

       The ALJ provided sufficient reasons for assigning little weight to Dr. Ilivicky's opinions. The opinions were provided in October 2015, almost ten months after Scott's insured status expired. Dr. Ilivicky saw Scott infrequently during the time right before and after the relevant period; he saw Scott only four times between June 2013 and December 2014. His treatment notes reveal Scott experienced some distress due to issues with her son and ex-husband, and was occasionally found to be slow and disheveled on examination. These findings are not supportive of a disabling mental impairment. Further, as the ALJ noted, Dr. Ilivicky did not

provide any specific limitations, but only offered the conclusion that Scott was unable to work. This is a finding reserved for the Commissioner. *See McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (judgment regarding whether a claimant is disabled is reserved for the Commissioner).

Scott next argues that the ALJ erred in according "little, if any" weight to the opinion of her treating therapist Stacy Guetschow. Like the opinion of Dr. Sattler discussed above, Ms. Guetschow provided an opinion that was submitted in connection with Scott's prior application. (Tr. 72.) Specifically, the decision of the prior ALJ indicates Ms. Guetschow authored a letter stating Scott should be on short-term disability starting on June 26, 2009. *Id.* There is no evidence from Ms. Guetschow in the instant record. Indeed, Ms. Guetschow's opinion that Scott was entitled to short-term disability in 2009 is not relevant to this case. Thus, Scott's claim lacks merit.

Although not directly challenged by Scott, the ALJ afforded "very little weight" to the opinion of her chiropractor, Dr. David S. Turnbull., as it did not pertain to the relevant period. (Tr. 26.) The ALJ next discussed the opinion of pain management physician Stephen Schmidt, M.D. (Tr. 26.) Dr. Schmidt completed a form dated October 5, 2017, in support of Scott's application for disabled license plates. (Tr. 26, 409-10.) He expressed the opinion that Scott cannot ambulate or walk fifty feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic, or other severe and disabling condition. *Id.* He indicated that this was a "temporary disability" expiring on January 5, 2018. *Id.* The ALJ assigned "very little weight" to this opinion because: (1) it was untimely, as it was provided nearly three years after Scott's date last insured; (2) the limitations were described as temporary; and (3) it was not supported by any explanatory rationale or specific findings. (Tr. 26.) The ALJ provided proper

reasoning for according little weight to the opinions of Drs. Turnbull and Schmidt.

   2.   RFC

Scott next argues that there is no medical evidence in the record addressing her physical ability to perform in the workplace. Scott contends that the ALJ was therefore required to develop the record. She argues that the ALJ's failure to obtain additional medical evidence renders the RFC without the support of substantial evidence.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and the claimant's description of her limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).

In determining Scott's RFC, the ALJ discussed the objective medical evidence. He first summarized Scott's history of back surgeries. He stated that Scott developed chronic low back pain due to lumbar degenerative disc disease in 2006 and underwent lumbar spine hemilaminectomy and microdiscectomy surgery at L4-L5 and L5-S1 in January 2008. (Tr. 22, 71-73.) Scott continued to complain of low back pain symptoms following surgery. *Id.* She underwent a spinal cord stimulator implantation in June 2008. *Id.* A CT scan of the lumbar spine Scott underwent in March 2009 revealed a mild disc bulge at the L4-L5 level that was

unchanged from earlier studies.  *Id.*  Scott has continued to complain of low back pain.  *Id.*

Scott presented to pain management physician, Brian Smith, M.D., on November 3, 2014—her alleged onset of disability date—with complaints of pain in her lower back, right leg, and right hip.  (Tr. 22, 264.)  She reported that she was doing well on her regimen of Methadone[2] and Norco.[3]  *Id.*  Dr. Smith noted that Scott "reiterates that she does well on her combination of medicine."  *Id.*  Upon examination, Scott was in no acute distress; she appeared well-groomed; there were no bodily deformities visible upon examination; she was oriented to person, place, and time; her recent and past memory appeared appropriate as tested by her ability to recall past and present particulars of history; her affect was normal; her mood as appropriate; and she did not exhibit any signs of depression or undue anxiety.  (Tr. 264-65.)  Dr. Smith diagnosed Scott with lumbar post-laminectomy syndrome, and refilled her prescriptions for Methadone and Norco.  (Tr. 265.)  She was instructed to return for follow-up in three months.  *Id.*  Scott returned on January 15, 2015, reporting that she ran out of one of her medications and requesting an increase in her dosage of Methadone.  *Id.*  She reported an increase in her pain, in that her medications provided about thirty percent relief.  *Id.*  On examination, Scott was in no acute distress, was well-groomed, oriented, her recent and past memory appeared appropriate, her affect was normal, her mood was appropriate, and she did not exhibit any signs of depression or undue anxiety.  (Tr. 266-67.)  Dr. Smith increased Scott's Methadone, although he advised her he was not sure an increase was what she needed.  (Tr. 267.)

---

[2]Methadone is a narcotic analgesic.  *See* WebMD, http://www.webmd.com/drugs (last visited March 25, 2020).

[3]Norco contains a combination of narcotic (hydrocodone) and non-narcotic (acetaminophen) analgesics and is indicated for moderate to severe pain.  *See* WebMD, http://www.webmd.com/drugs (last visited March 25, 2020).

Scott underwent x-rays of the lumbar spine on January 19, 2015, which revealed scoliosis with right convexity at L3, degenerative disc space narrowing and anterior and posterior spondylosis at L4-L5, osteopenia, and normal lumbar vertebral heights. (Tr. 22, 442.)

Scott established care with chiropractor Dr. David Turnbull on January 21, 2015, at which time she complained of right-sided back, hip, and leg pain for four days, following a motor vehicle accident that had occurred on January 16, 2015. (Tr. 23, 436.) Upon examination, Scott had a slightly antalgic gait, severely restricted lumbar range of motion on extension, moderately restricted lumbar range of motion on flexion, and negative straight leg raise test. (Tr. 23, 437.)

The ALJ noted that the medical evidence demonstrates some subsequent worsening of Scott's lumbar post-laminectomy syndrome after her date last insured. (Tr. 23.) For example, in June 2016, Dr. Smith observed Scott walked very slowly and had difficulty rising from a seated to a standing position. (Tr. 23, 299.) In October 2016, Dr. Smith noted that Scott ambulated with a cane to help steady her gait. (Tr. 23, 301.) In September 2017, Dr. Smith observed tenderness along the lumbar paraspinous muscles and a positive straight leg raise bilaterally. (Tr. 423.) Scott underwent a CT scan of her lumbar spine in September 2017, which revealed lumbar facet arthropathy and some mild stenosis. (Tr. 23, 426.)

The ALJ stated that there was no diagnostic imaging showing any disc herniation, neuroforaminal or central canal stenosis, arachnoiditis, or nerve root impingement prior to the date last insured. (Tr. 23.) Additionally, Scott did not demonstrate an abnormal gait, decreased lumbar range of motion, abnormal lower extremity strength or sensation, the use of an assistive device, or positive straight leg raise testing during the relevant period. (Tr. 23-24.) Rather, at her only treatment visit during the period at issue, she reported that she was doing well on her

medication regimen . (Tr. 24, 264.) Her pain management physician did not restrict her activities, and instead encouraged her to be active. *Id.* There is no evidence Scott received emergency room or urgent care treatment for pain during the relevant period. (Tr. 24.) The ALJ concluded that the imaging results, findings on clinical examination, and Scott's course of treatment all support the determination that she retained the ability to perform a limited range of light work through her date last insured. *Id.*

With regard to Scott's mental impairments, the ALJ first noted that Scott underwent a psychological examination performed by Dr. David Lipsitz on March 31, 2011, in connection with her prior application for benefits. (Tr. 25.) Dr. Lipsitz diagnosed Scott with borderline intellectual functioning, based on IQ testing he administered. *Id.* The ALJ noted that, despite this diagnosis, Scott has not reported a history of special education services and instead completed medical assistant training at age 26. *Id.* Additionally, she has a long history of semi-skilled work at the level of substantial gainful activity, which she stopped performing in 2009 due to her physical, not intellectual, impairment. *Id.*

The ALJ next stated that Scott received treatment for her long history of depression with Dr. Ilivicky during the relevant period, and that Dr. Ilivicky prescribed and managed Scott's psychotropic medications. (Tr. 24.) He noted that there is no indication that Scott's symptoms worsened between the amended alleged onset date and the date last insured, and Scott did not require emergency care or inpatient hospitalization during this time. *Id.* At Scott's most recent visit with Dr. Ilivicky prior to her date last insured, on September 19, 2014, she exhibited a disheveled appearance, intermittent eye contact, slightly dysarthric speech, a constricted and fragile affect, and a decreased memory. (Tr. 24, 260.) On her November 3, 2014 visit with Dr. Smith, however, she displayed a well-groomed appearance, appropriate mood, normal affect,

appropriate recent and remote memory, and did not exhibit any signs of depression or undue anxiety. (Tr. 25, 265.) Dr. Smith noted the same findings at Scott's visit on January 15, 2015, shortly after her date last insured. (Tr. 25, 267.) The ALJ concluded that the overall evidence supports the finding that Scott retained the ability to perform simple, routine, and repetitive tasks through the date last insured.

In determining Scott's RFC, the ALJ also discussed inconsistencies in Scott's testimony. He noted that Scott testified at the hearing that she had been using a cane and a back brace since 2014, yet the record indicates otherwise. (Tr. 31, 56.) For example, Scott did not report using a cane on the function report completed in January 2016. (Tr. 31, 202-09.) Further, medical records do not note the usage of a cane until October 2016. (Tr. 31, 301.) Additionally, the ALJ pointed out that Scott traveled to California for a month to visit her sister in January of 2015, despite her allegations that she was unable to leave the house at that time due to her depression and pain. (Tr. 31, 51, 259, 266.) The ALJ properly considered these inconsistencies in Scott's statements.

Scott argues that the ALJ failed to properly develop the record in that he did not obtain additional medical evidence regarding Scott's physical limitations. An ALJ has a duty to fully and fairly develop the record, and failure to do so is reversible error when the record "does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work." *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012). "However, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant." *Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004). "An ALJ's duty to develop the record arises only if a crucial issue was undeveloped." *Leininger v. Colvin*, No. 4:12-CV-623 JCH/TIA, 2013 WL 5276039, at *14 (E.D. Mo. Sept. 18, 2013).

Here, the record as a whole contained sufficient evidence for the ALJ to make his determination. It is true that there is no medical opinion in the record mirroring the ALJ's RFC findings. No such opinion, however, is required. Although an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to her RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (emphasis in original).

The ALJ found that Scott had the RFC to perform light work with the following additional limitations: only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; could never climb ladders, ropes, or scaffolds; should avoid unprotected heights and exposure to hazardous machinery; and was limited to simple, routine, and repetitive tasks. (Tr. 21-22.)

In making this determination, the ALJ summarized the medical evidence from the relevant period and found it was inconsistent with Scott's allegations of disability. Treatment notes from on and around Scott's alleged onset of disability date reveal Scott was doing well on her prescription pain medication regimen, was in no acute distress, was well-groomed, was

oriented in all spheres, her memory was normal, her affect was normal, her mood was appropriate, and she did not exhibit any signs of depression or undue anxiety. The ALJ nonetheless credited Scott's allegations of pain and limitations related to her back impairment in limiting her to a very restricted range of light work. He took into account her mental impairments when limiting her to simple, routine, and repetitive work. The ALJ also properly considered the fact that Scott did not require use of an assistive device and that she was able to travel to California within a month after the relevant period. The Court finds that substantial evidence on the record as a whole supports the ALJ's RFC determination. Scott has failed to demonstrate the presence of a disabling impairment during the relevant period.

In her final argument, Scott contends that the ALJ failed to apply the lower of two exertional levels of the Grids. In support, Scott cites the applicable regulations, including the statement that vocational expert testimony is advisable for cases in which exertional limitations are "in the middle" of regulatory criteria. (Doc. 14 at p. 9.) Scott's argument lacks merit. The ALJ in the instant case did not apply the Grids. Instead, he obtained the testimony of a vocational expert to "determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured." (Tr. 33.) The vocational expert testified that Scott was capable of performing other work existing in significant numbers in the national economy. *Id.* Thus, the ALJ complied with the relevant Regulations in finding Scott was not disabled during the relevant period.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of March, 2020.